IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CALVIN CHRISTOPHER GRIFFIN, | ) | Civ. No. 20-00454 SOM/KJM |
| | ) | |
| Plaintiff | ) | ORDER GRANTING MOTIONS TO |
| | ) | DISMISS |
| vs. | ) | |
| | ) | |
| CLARE CONNORS; SCOTT NAGO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**ORDER GRANTING MOTIONS TO DISMISS**

**I.      INTRODUCTION.**

In the 2020 primary election for the seat in the United States House of Representatives from Hawaii's First Congressional District, Plaintiff Calvin Christopher Griffin ran as a nonpartisan candidate.  Under section 12-41 of Hawaii Revised Statutes, to advance to the general election, a nonpartisan candidate must receive either (1) at least 10 percent of the total votes cast in the primary, or (2) at least the same number of votes as the winner of a partisan primary who had the lowest number of votes among all partisan primary winners for the seat in issue.  In the primary election, Ed Case secured the Democratic Party's nomination with 131,802 votes, and Ron Curtis secured the Republican Party's nomination with 13,909 votes.  Griffin received 2,324 votes.  That number did not meet either threshold, and Griffin was not included on the general election ballot.

Ed Case prevailed in the 2020 general election, and he has now taken his seat in Congress.  While Griffin did file this action before the general election took place, he did not file a motion seeking a ruling that the state had to place his name on the general election ballot.  Instead, well after the election had concluded, Griffin filed the now-operative complaint, which argues that because section 12-41 violates the Fourteenth Amendment of the Constitution, he is entitled to $50,000,000 and the inclusion of his name on the general election ballot.

Defendants Clare Connors, Hawaii's Attorney General, and Scott Nago, Hawaii's Chief Election Officer, now ask this court to dismiss the operative complaint.  They argue that Griffin's requests for retrospective relief are barred by the Eleventh Amendment and that Griffin has failed to allege that section 12-41 is unconstitutional.  This court agrees.  Griffin's claims against Connors and Nago in their official capacities are barred by sovereign immunity, and he fails to state a claim against Connors or Nago in their individual capacities. Griffin's complaint is dismissed with prejudice.

II.      **BACKGROUND.**

   A.   **Primary Elections in Hawaii.**

This cases arises out of the 2020 primary election for the seat in the United States House of Representatives from Hawaii's First Congressional District.  "To obtain a position on

the November general election ballot, a candidate[1] must participate in Hawaii's open primary,[2] in which all registered voters may choose in which party primary to vote." *Burdick v. Takushi*, 504 U.S. 428, 435 (1992). "The State provides three mechanisms through which a voter's candidate-of-choice may appear on the primary ballot." *Id.*

**New Parties**. First, an individual who wishes to form a new political party may file a party petition 150 days before the primary election if the individual obtains the signatures of 0.1 percent of the State's registered voters. Haw. Rev. Stat. § 11-62(a). Once a party is formed, candidates may run in that party's primary by filing nominating papers certifying, among other things, that they will qualify for the office sought and that they are members of the party that they seek to represent in the general election. Haw. Rev. Stat. § 12-3. In a congressional election, the nominating paper must be signed by 25 registered voters. Haw. Rev. Stat. § 12-5. The candidate who

---

[1]  Presidential candidates do not participate in the open primary. *See generally Nader v. Cronin*, 620 F.3d 1214, 1215 (9th Cir. 2010).

[2]  In an open primary, "voters must commit to one party's slate prior to voting; they may not choose a Republican nominee for one state office and a Democratic nominee for a different state office." *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1121 (9th Cir. 2016); *see also id*. at 1125 ("Hawaii's open primary, unlike a blanket primary, forces a voter to choose one party's primary ballot and thereby forego her opportunity to participate in a different party's primary.").

receives the most votes in a new party's primary advances to the general election.  Haw. Rev. Stat. § 12-41.

**Established Parties.**  Second, an individual may seek to become the candidate of an established party.  After becoming certified as a party under the procedures discussed above, a political party must obtain a specified percentage of the vote in the subsequent general election to avoid disqualification.  Under Haw. Rev. Stat. § 11-61(b), a party is disqualified if it does not:

> (2) [Receive] at least ten per cent of all votes cast:
>
> > (A) For any of the offices voted upon by all the voters in the State; or
> >
> > (B) In at least fifty per cent of the congressional districts; or
>
> (3) [Receive] at least four per cent of all the votes cast for all the offices of state senator statewide; or
>
> (4) [Receive] at least four per cent of all the votes cast for all the offices of state representative statewide; or
>
> (5) [Receive] at least two per cent of all the votes cast for all the offices of state senate and all the offices of state representative combined statewide.

4

Parties that avoid disqualification become established parties.[3]
*See* Haw. Rev. Stat. § 11-62(d).

Like new party candidates, prospective established party candidates must file nominating papers certifying that they will qualify for the office sought and that they are members of the party that they seek to represent in the general election. Haw. Rev. Stat. § 12-3.  The candidate who receives the most votes in an established party's primary election advances to the general election.

**Nonpartisan Candidates.**  Third, a candidate may appear on the designated nonpartisan ballot.  In a congressional election, a nonpartisan need only file nominating papers signed by 25 registered voters to appear on the primary election ballot. Haw. Rev. Stat. § 12-5.  To advance to the general election, a nonpartisan candidate must receive either (1) at least 10 percent of the total votes cast in the primary, or (2) at least as many votes as the successful partisan candidate who received the least

---

[3] Parties may also become established parties by placing candidates on the ballot in three consecutive general elections, either by satisfying the new party requirements of Haw. Rev. Stat. § 11-62(a) or by avoiding disqualification under Haw. Rev. Stat. § 11-61(b).  Parties that do so are "deemed a political party for the following ten-year period."  Haw. Rev. Stat. § 11-62(d).  "After each ten-year period, the party qualified under this section shall either remain qualified under the standards set forth in section 11-61, or requalify under . . . section 11-62."  *Id.*

votes.  Haw. Rev. Stat. § 12-41.  Section 12-41(b) reads as follows:

> Any nonpartisan candidate receiving at least ten per cent of the total votes cast for the office for which the person is a candidate at the primary or special primary, or a vote equal to the lowest vote received by the partisan candidate who was nominated in the primary or special primary, shall also be a candidate at the following election; provided that when more nonpartisan candidates qualify for nomination than there are offices to be voted for at the general or special general election, there shall be certified as candidates for the following election those receiving the highest number of votes, but not more candidates than are to be elected.

### B.    Griffin's Candidacy.

In 2020, Griffin ran as a nonpartisan candidate in Hawaii's First Congressional District.  *See* Final Summary Report, Statewide Primary Election 2020, https://files.hawaii.gov/ elections/files/results/2020/primary/histatewide.pdf.[4]  In the primary election, Ed Case secured the Democratic Party's nomination with 131,802 votes, and Ron Curtis secured the Republican Party's nomination with 13,909 votes.  *Id.*  Griffin received 2,324 votes, or 53.7 percent of the votes cast

---

[4] Because the Second Amended Complaint refers to the Final Summary Report and Griffin's claims rely on that document, this court considers the Final Summary Report in deciding the State's motion to dismiss.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (holding that a document is incorporated by reference in a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim).

(including blank votes) for nonpartisan candidates and 1.12 percent of the 198,571 total votes cast (including for those running as members of political parties).  *Id.*

Griffin therefore did not receive enough votes to advance to the general election.  Although Griffin, as the only nonpartisan candidate, received the most votes of any nonpartisan candidate in his primary, he did not satisfy section 12-41(a)'s other requirements.  He received 1.12 percent of the total votes cast and fewer votes than the winning Democratic or Republican candidate.  As a result, he did not appear on the ballot in the general election.

###### C. Procedural Background.

On October 21, 2020, Griffin filed the present action against the State of Hawaii and the State of Hawaii's Office of Elections.  The original complaint appeared to allege that section 12-41 violated the Fourteenth Amendment by discriminating against nonpartisan candidates.  ECF No. 1, PageID # 1-2.  Griffin's October complaint sought an award of $50,000,000 in "compensatory and punitive damages" and an injunction ordering the State to place his name on the general election ballot.  *Id.* at 3.  However, after filing his complaint about two weeks before the general election, which was held on November 3, 2020, Griffin took no action before this court.  The commencement of a lawsuit does not, without more, usually trigger this court to

address substantive issues raised in a complaint, and this court did not leap to address such issues.

On December 9, 2020, after his name had not appeared on the general election ballot, Griffin filed his First Amended Complaint against the same defendants.  ECF No. 9.  The First Amended Complaint continued to assert that section 12-41 was unconstitutional, but it sought new relief.  Griffin requested an order compelling the State to conduct a special election to "redo" the election for the United States House of Representatives in Hawaii's First Congressional District and an award of $50,000,000.  *Id.* at 20.

On December 28, 2020, the defendants moved to dismiss Griffin's claims on the ground that any claims against the State of Hawaii and the Office of Elections were barred by the Eleventh Amendment and the doctrine of sovereign immunity.  ECF No. 10-1, PageID # 40.  On February 9, 2021, this court granted the defendants' motion.  ECF No. 21, PageID # 74.  However, because Griffin could have conceivably brought a claim for prospective relief against state officials under the *Ex parte Young* doctrine, this court allowed Griffin to file an amended complaint.  *Id.* at 73-74.

On March 1, 2021, Griffin filed a second amended complaint.  ECF No. 22.  Then, on March 10, 2021, Griffin filed a revised second amended complaint without seeking leave of court.

ECF No. 24.  Although Griffin did not have permission to file the revised second amended complaint, for the purposes of deciding the present motions, this court treats the revised document filed on March 10 as the operative Second Amended Complaint.

The Second Amended Complaint repeated the allegation that section 12-41 violates the Fourteenth Amendment.  This time, however, Griffin added claims under 42 U.S.C. § 1983 against Clare Connors, Hawaii's Attorney General, and Scott Nago, Hawaii's Chief Elections Officer.[5]  ECF No. 24, PageID # 86.  The Second Amended Complaint seeks an order placing Griffin's name "on the 2020 General Election ballot as a candidate for the Representative of [the First] Congressional District," and "50 million dollars in compensatory and punitive damages."  *Id.* at 88.

Connors and Nago have both moved to dismiss.  ECF Nos. 27, 31.  They argue that (1) Griffin fails to state a constitutional claim, ECF No. 27-1, PageID # 105-07, ECF No. 30-1, PageID # 129-31, (2) Griffin's claims against Connors and Nago in their official capacities are barred by the Eleventh Amendment, ECF No. 27-1, PageID # 107-10, and (3) Griffin fails to allege that either Connors or Nago committed any acts that

---

[5]  The Second Amended Complaint does not specify whether Connors and Nago are sued in their individual capacities, their official capacities, or both.

could render them liable in their individual capacities.  ECF No. 27-1, PageID # 110-12; ECF No. 30-1, PageID # 132-33.

## III.      LEGAL STANDARD.

### A.    Rule 12(b)(1).

Under Rule 12(b)(1), a complaint may be dismissed for lack of subject matter jurisdiction.  An attack on subject matter jurisdiction "may be facial or factual."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial attack asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction[,]" while a factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*

The State appears to bring a facial attack.  *See* ECF No. 10-1, PageID # 39-40.  In deciding such a motion, a court must assume the facts alleged in the complaint to be true and construe them in the light most favorable to the nonmoving party. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  However, courts "do not accept legal conclusions in the complaint as true, even if 'cast in the form of factual allegations.' " *Lacano Invs., LLC v. Balash*, 765 F.3d 1068, 1071 (9th Cir. 2014) (emphasis in original) (quoting *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009)).

### B.    Rule 12(b)(6).[6]

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court's review is generally limited to the contents of a complaint.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996).  On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss.  *Sprewell*, 266 F.3d at 988; *Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).

"[T]o survive a Rule 12(b)(6) motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact."

---

[6] In the Ninth Circuit, "[i]t is not entirely clear whether an Eleventh Amendment challenge should be analyzed under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction or under Rule 12(b)(6) for failure to state a claim upon which relief can be granted."  *Monet v. Hawaii*, 2011 WL 2446310, at *3 (D. Haw. June 14, 2011).  But, in this case, "whether the court examines Eleventh Amendment immunity under Rule 12(b)(1) for lack of jurisdiction or under Rule 12(b)(6) for failure to state a claim makes no difference, as those standards are essentially the same for purposes of this motion."  *Id.*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

IV.     **ANALYSIS.**

      A.   **Griffin's Claims against Connors and Nago in Their Official Capacities are Barred by the Eleventh Amendment.**

      Connors and Nago first argue that any claims brought against them in their official capacities are barred by the Eleventh Amendment.  ECF No. 27-1, PageID # 107-10.  Because that argument implicates this court's power to hear the case, this court addresses it at the outset.  In general, the "Eleventh

Amendment bars actions against states, state agencies, or departments of a state unless a state waives sovereign immunity or Congress exercises its power to override the immunity." *Trotter v. Hawaii*, 2018 WL 912255, at *4 (D. Haw. Feb. 15, 2018). However, under the doctrine first set forth in *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff may proceed against individual state officials in their official capacities under certain circumstances.  *See Trotter*, 2018 WL 912255, at *4.

  *Ex parte Young* ensures that the federal courts have the power to put a stop to ongoing violations of federal law.  *See Papasan v. Allain*, 478 U.S. 265, 276-78 (1986).  The doctrine has been "tailored to conform as precisely as possible" to that goal. *Id.* at 277.  It permits plaintiffs to seek prospective relief, *i.e.,* relief that seeks to end continuing violations, but not retrospective relief.  Thus, permissible suits generally assert that "a violation of federal law by a state official is ongoing," whereas prohibited suits allege that "federal law has been violated at one time or over a period of time in the past." *Id.* at 277-78.

  Griffin is not seeking prospective relief.  First, Griffin requests $50,000,000 in compensatory and punitive damages.  ECF No. 24, PageID # 88.  He allegedly sustained those damages as a result of the "extreme mental [and] emotional distress" that he sustained when his name was not placed on the

general election ballot.  *See id.*  He is therefore seeking compensation for past harm.  That is the paradigm example of a request for retrospective relief that is precluded by the Eleventh Amendment.  *Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007) ("The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities."); *Bair v. Krug*, 853 F.2d 672, 675 (9th Cir. 1988) ("Put simply, the eleventh amendment bars actions against state officers sued in their official capacities for past alleged misconduct involving a complainant's federally protected rights, where the nature of the relief sought is retroactive, *i.e.*, money damages.").

Griffin's second claim for relief is a request that his name "be recognized and placed on the 2020 General Election ballot as a candidate for the Representative of [the First] Congressional District[.]"  ECF No. 24, PageID # 88.  That request does not involve an ongoing constitutional violation either.  Any purported wrongdoing occurred on November 3, 2020, when the general election ballot was distributed.  The general election is now over.  The results of the election have been certified, and Ed Case has taken his seat in Congress.  *See* Haw. Rev. Stat. § 11-155.  There is no continuing violation of federal law with respect to a completed election.

Had Griffin acted before the general election, his request would have been prospective.  The necessary action was the filing of a motion calling on the court to make a specific ruling.  It was not sufficient for Griffin to simply file a complaint.  A complaint commences a civil action, but it does not require a judge to propose a motion on a plaintiff's behalf.  If Griffin had filed a motion, then, if this court agreed that his claims had merit (which, as discussed below, it does not), this court could have ordered the State of Hawaii to place his name on the general election ballot.  That did not occur.  Griffin simply waited without taking action after he commenced this lawsuit.

At this late date, the court cannot order the state to make changes to the general election ballot when the ballots have already been distributed, the votes have already been counted, and Ed Case has already been certified as the winner.  Nor can this court retrospectively invalidate the results of the election that has concluded.  Griffin is asking the court to correct an alleged violation that occurred "at one time . . . in the past."[7] *Papasan*, 478 U.S. at 276-77.  That, under the Eleventh Amendment, this court cannot do.  *See id.*; *see also Rios v. Blackwell*, 433 F. Supp. 2d 848, 850 (N.D. Ohio 2006) (holding that a challenge to a completed election was barred by sovereign immunity).

---

[7]  Not only did Griffin fail to act before the date of the general election, he does not allege that the results of the election would have been different if he had been on the ballot.

Griffin's claims are barred by the doctrine of sovereign immunity.

Any other ruling would undermine the finality of elections and lead to absurd results.  United States senators, for instance, are elected to six-year terms.  Five years into a term, a defeated challenger cannot ask for a new election based on purported flaws in the ballots distributed two general elections ago.  The election laws set a deadline for bringing such challenges.  *See generally* Haw. Rev. Stat. § 11-174.5.  Once that deadline has passed, defeated candidates cannot undermine the stability of our political system by asking a court to undo an election's results.

This court recognizes that the Ninth Circuit has held that some challenges to an election that has already occurred may be considered prospective.  *Bennett v. Yoshina*, 140 F.3d 1218, 1224 (9th Cir. 1998).  *Bennett* involved a Hawaii ballot initiative that asked voters whether a constitutional convention should be held.  *Id.* at 1222.  On that question, 163,869 voters marked "yes" in their ballots, 160,153 marked "no," and 45,245 left the question blank.  *Id.*  After the election, the Hawaii Supreme Court ruled that leaving the question blank had the same effect as voting "no," and therefore held that the measure had been defeated.  *Id.* at 1222-23.  The plaintiffs then filed a federal action arguing that the Hawaii Supreme Court's

interpretation of the state's electoral laws violated the Constitution. *Id.* at 1223. On appeal, the State of Hawaii argued that because the election had already occurred, the plaintiffs were seeking retrospective relief and the claims were barred by the Eleventh Amendment. *Id.* at 1224.

        The Ninth Circuit disagreed:

> [The State of Hawaii] argues that no ongoing
> constitutional violation exists, reasoning
> that the November 5, 1996, election has
> already taken place and whatever problems may
> have occurred are unlikely to be repeated.
> In effect, [Hawaii] argues that completed
> state election mishaps can never be reviewed
> in federal court because once the election
> has occurred, any relief would be
> retrospective. The flaw in this argument is
> [Hawaii's] unduly narrow conception of the
> alleged constitutional injury. If, after
> ruling that blank ballots counted against the
> convention question, the Hawaii Supreme Court
> had also decided that it was unfair to
> surprise voters with this new rule and
> ordered a new election, we do not suppose
> that Bennett would have troubled himself with
> a federal lawsuit. What Bennett objects to
> is not the mere occurrence of an allegedly
> unfair vote, but the state's decision to give
> effect to that vote. *And obviously, the
> legal effectiveness of the 1996 vote—i.e.,
> whether a constitutional convention will take
> place—is something that will, or will not,
> happen in the future.* Thus, we conclude that
> Bennett seeks prospective, not retrospective,
> relief.

*Id.* (emphasis added).

        Griffin also challenges a completed election, but here the circumstances are different in two respects. First, Griffin's claim involves the content of the general election

ballot, whereas the plaintiffs in *Bennett* challenged the methods for counting votes.  Second, in *Bennett*, the Ninth Circuit ruled before the "legal effectiveness" of the election had been determined.  Here, the results of the 2020 congressional election have already been certified, and Ed Case has taken his seat in Congress.

It made sense for the Ninth Circuit to view *Bennett* as a case involving an ongoing constitutional violation.  The plaintiffs could not have filed a lawsuit before the election, because they did not know that the Hawaii Supreme Court would decide that blank ballots effectively counted as "no" votes.  *See id.* at 1222-23.  And to the extent that the Hawaii Supreme Court's decision violated the Constitution, that hypothetical violation remained ongoing until the results of the election became legally effective.  Thus, *Bennett* involved a purportedly continuing wrong that the federal courts could have put a stop to.[8]

---

[8] In *Bennett*, the Ninth Circuit cited three other cases involving challenges to completed elections with approval: *Roe v. Alabama*, 43 F.3d 574 (11th Cir. 1995), *Curry v. Baker*, 802 F.2d 1302 (11th Cir. 1986), and *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978).  All three cases involved challenges to the state's method of counting votes, and the challenges were brought before the results of the elections were certified.  *Roe*, 43 F.3d at 578-79 (addressing challenge to state's decision not to count absentee ballots); *Curry*, 802 F.2d at 1305 (addressing claims that illegal votes were cast in primary election); *Griffin*, 570 F.2d at 1066-68 (addressing challenge to state's decision not to count absentee ballots).

That is not the case here.  The general election is over, and Griffin is now asking this court to go back to November 2020 and invalidate the results of the election based on purported flaws in the contents of the general election ballot. That is a retrospective request.  Griffin's claims against Connors and Nago in their official capacities[9] are barred by the Eleventh Amendment.

### B.   Griffin Fails to State a Claim Against Connors or Nago in their Individual Capacities.

That leaves Griffin's claims against Nago and Connors in their individual capacities.  Those claims also lack merit. His claims against Connors must be dismissed because he has not alleged that Connors took any action that caused him harm.  And while he has implicitly alleged that Nago applied section 12-41 and decided that Griffin had not qualified for the general election ballot, he has not stated a claim that section 12-41 is unconstitutional.

---

[9] Even though this court's decision dismissing Griffin's last complaint discussed the possibility that Griffin might seek declaratory relief, ECF No. 21, PageID # 74 (citing *Caruso v. Yamhill Cty. ex rel. Cty. Com'r*, 422 F.3d 848, 853 (9th Cir. 2005), and *Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000)), the Second Amended Complaint does not expressly seek a declaration that section 12-41 is unconstitutional.

### 1.   Griffin Does Not State a Claim Against Connors.

As an initial matter, Griffin's individual capacity claims against Connors fail because he has not alleged that Connors took any action that caused him harm.  Section 1983 requires "a connection or link between the defendant's own actions" and the alleged violation of the plaintiff's constitutional rights.  *Denis v. Ige*, 2021 WL 1911884, at *13 (D. Haw. May 12, 2021).  Griffin has not provided that link here.  He has not identified any actions attributable to Connors that violated the Constitution or caused him to suffer harm.  He has therefore failed to state a claim against Connors.

### 2.   Griffin Does Not State a Claim Against Nago.

Griffin's individual capacity claims against Nago fare no better.  Griffin implicitly alleges that, as the head of the Office of Elections, Nago was responsible for applying section 12-41 and concluding that Griffin had failed to qualify for the general election ballot.  Thus, he has alleged that Nago's actions harmed him.  *See Hafer v. Melo*, 502 U.S. 21, 28 (1991) (explaining that "Congress enacted § 1983 to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it" (internal quotations marks omitted)).  His claims against Nago

20

nevertheless must be dismissed because he has not sufficiently alleged that section 12-41 is unconstitutional.

The standards governing Griffin's challenge to Hawaii's election laws are well-established.  "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted).  The Ninth Circuit has "described this approach as a 'sliding scale'—the more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019).  "To pass constitutional muster, a state law imposing a severe burden must be narrowly tailored to advance 'compelling' interests." *Id.* "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434; *see also Ariz. Libertarian Party*, 925 F.3d at 1090 ("On the other hand, a law

imposing a minimal burden need only reasonably advance 'important' interests.").

Construed liberally, Griffin's complaint appears to claim that section 12-41 infringes on his right to access the ballot guaranteed by the First and Fourteenth Amendments and violates the Equal Protection Clause of the Fourteenth Amendment. Under the framework described above, both claims fail.

> a. **Griffin Does Not State a Claim that Section 12-41 Infringes on His Right to Access the Ballot.**

Griffin first appears to contend that section 12-41 violates his right to access the ballot. *See* ECF No. 38, PageID # 147 (characterizing section 12-41 as an "impediment[] . . . that limits who is qualified to seek public office"). "It was long ago established that a state may condition ballot placement on a 'preliminary showing of a significant modicum of support.'" *Ariz. Libertarian Party*, 925 F.3d at 1091 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). Courts therefore evaluate the burden a state law places on candidates' right to access the ballot by asking whether the law requires candidates to do *more* than show a significant modicum of support to have their name placed on the general election ballot.

In *Jenness*, for instance, the Supreme Court held that a Georgia law that required a nonpartisan candidate to file "a nominating petition signed by at least 5 percent of the number of

registered voters at the last general election for the office in question" to obtain access to the general election ballot did not violate the Constitution.  403 U.S. at 432, 439-40.  Relying on *Jenness* and its progeny, the Ninth Circuit has held that in cases involving a nominating petition and a signature requirement, "there is no dispute that a state may require a candidate to demonstrate support from slightly, but not 'substantially,' more than 5 percent of voters without imposing a severe burden triggering heightened scrutiny." *Ariz. Libertarian Party*, 925 F.3d at 1091.

The constitutionally allowable percentage may be affected by whether nonpartisan candidates can get on general election ballots through primary elections, rather than nominating petitions. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986); *Erum v. Cayetano*, 881 F.2d 689, 694 (9th Cir. 1989).  In *Munro*, the plaintiff challenged a Washington law that required minor-party candidates to receive 1 percent of the votes cast in a primary election to advance to the general election.  479 U.S. at 191-92.  The Supreme Court held the law constitutional.  479 U.S. at 199.  The Court explained that laws that require a candidate to receive a specified percentage of the vote in a primary election to advance to the general election almost always impose a slight burden on the candidate's right to access the ballot:

We also observe that § 29.18.110 is more
accommodating of First Amendment rights and
values than [statues involving nominating
petitions] . . . .  Washington virtually
guarantees what the parties challenging the
Georgia, Texas, and California election laws
so vigorously sought—candidate access to a
statewide ballot.  This is a significant
difference.  Washington has chosen a vehicle
by which minor-party candidates must
demonstrate voter support that serves to
promote the very First Amendment values that
are threatened by overly burdensome ballot
access restrictions.  *It can hardly be said
that Washington's voters are denied freedom
of association because they must channel
their expressive activity into a campaign at
the primary as opposed to the general
election. It is true that voters must make
choices as they vote at the primary, but
there are no state-imposed obstacles
impairing voters in the exercise of their
choices*. . . .

*Jenness* and *American Party* rejected
challenges to ballot access restrictions that
were based on a candidate's showing of voter
support, notwithstanding the fact that the
systems operated to foreclose a candidate's
access to any statewide ballot.  Here,
because Washington affords a minor-party
candidate easy access to the primary election
ballot and the opportunity for the candidate
to wage a ballot-connected campaign, we
conclude that the magnitude of § 29.18.110's
effect on constitutional rights is slight
when compared to the restrictions we upheld
in *Jenness* and *American Party*.

479 U.S. at 198-99 (emphasis added).

In *Erum*, the Ninth Circuit applied *Munro*'s reasoning to

section 12-41's requirement that nonpartisan candidates either

receive 10 percent of the total vote or as many votes as the

partisan candidate with the least votes to advance to the general

election.  The Ninth Circuit noted several differences between section 12-41 and the Washington statute upheld by the Supreme Court in *Munro*.  As an initial matter, "while the Washington statute operate[d] in conjunction with a 'blanket primary' statute that allows primary voters to vote for candidates of all parties regardless of office, Hawaii's statutory scheme prevents this type of 'cross-over voting.'"  *Erum*, 881 F.2d at 693.  In addition, "the Washington statute require[d] that a minor party candidate only receive at least 1 percent of all votes cast for the office for which the candidate runs, not 10 percent, as in Hawaii."  *Id.* at 693-94.

Despite these differences, the Ninth Circuit explained that "the linchpin of *Munro* is not the smallness of the vote percentage required in the primary election."  *Id.* at 694.  Instead, *Munro* held that "the effect on a candidate's constitutional rights is 'slight' when a state affords a candidate easy access to the primary election ballot and the opportunity to wage a ballot-connected campaign."  *Id.* at 693.  Because Hawaii afforded candidates easy access to the primary election ballot, section 12-41 only placed a slight burden on candidates' access to the ballot.  *Id.*

In *Lightfoot v. Eu*, the Ninth Circuit called *Erum*'s continuing validity into question. 964 F.2d 865, 868 (9th Cir. 1992), *as amended* (July 6, 1992).  *Lightfoot* concluded "that

25

*Erum*'s holding that strict scrutiny does not apply in ballot-access cases has been overruled by [*Norman v. Reed*, 502 U.S. 279 (1992)]." 964 F.2d at 868. But the Ninth Circuit subsequently amended its opinion by adding a footnote that retracted its earlier criticism:

> Since this opinion was originally filed, the Supreme Court has further clarified its position on the level of scrutiny it will apply to election laws. *It now appears that we were wrong to conclude that Norman stood for the proposition that laws that burden voting rights should always be subject to strict scrutiny and that it consequently overruled Erum.*

964 F.2d at 868 n.2 (emphasis added).[10]

That footnote indicates that *Erum* is still good law. Because section 12-41 has not changed, *Erum* is controlling. Section 12-41 only places a slight burden on a candidate's right to access the ballot. 881 F.2d at 693-94.

Consequently, section 12-41 survives if it is justified by "important" regulatory interests. *Ariz. Libertarian Party*, 925 F.3d at 1090. The Ninth Circuit identified two such interests in *Erum*: "Hawaii's interest in combating unrestrained factionalism" and "Hawaii's interest in avoiding voter confusion

---

[10] In *Erum*, the court held that because the law imposed a slight burden on the plaintiff's constitutional rights, it could be justified by "major" interests that had been "found to be compelling in other contexts." 881 F.2d at 693-94. That is essentially the same test that the Ninth Circuit applies today. *See generally Ariz. Libertarian Party*, 925 F.3d at 1090.

and overcrowded ballots."  881 F.2d at 693 (internal quotation marks omitted).  The strength of those interests has not waned in the 30 years since *Erum* was decided.  Those interests continue to be sufficiently important to justify the burden section 12-41 places on candidates' right to access the ballot.

This court recognizes that *Erum* involved a motion for summary judgment, not a motion to dismiss.  But in *Erum*, the Ninth Circuit concluded that section 12-41 imposed slight burdens that were justified by the state's important regulatory interests without examining any evidence submitted by the State. Similarly, in *Munro*, the Supreme Court held that it had "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access."  479 U.S. at 194–95. Requiring a state to make that showing would "invariably lead to endless court battles over the sufficiency of the evidence marshaled by a State" and "necessitate that a State's political system sustain some level of damage before the legislature could take corrective action."  *Id.* at 195.  Accordingly, Defendants do not have to submit evidence in response to Griffin's constitutional challenge.[11]  Because, under controlling law,

---

[11] In *Soltysik v. Padilla*, the Ninth Circuit reversed a decision dismissing a plaintiff's claim that California infringed on his right to access the ballot by requiring him to include a

Griffin has failed to state a claim that section 12-41 infringes on his right to access the ballot, his claims based on that right must be dismissed.

> **b.   Griffin Does Not State a Claim that Section 12-41 Violates the Equal Protection Clause.**

Griffin also maintains that section 12-41 violates the Equal Protection Clause[12] because it "discriminates against nonpartisan candidates."  ECF No. 24, PageID # 86.  According to Griffin, "[t]he two political parties acting under color of state authority enacted this self-interested legislation" that prevents other challengers from accessing the general election ballot.  *Id.* at 86-87.  In other words, Griffin is contending that the Democratic and Republican parties have created an electoral scheme that makes it difficult for other candidates to access the ballot.  That claim also fails.  Griffin does not state a claim

---

misleading label next to his name on the primary ballot.  910 F.3d 438, 442, 446 (9th Cir. 2018).  *Soltysik* is distinguishable for two reasons.  First, the burden imposed by the California law was "more than slight" because the label was affirmatively misleading.  *Id.* at 445-46.  Second, it did not appear to the court that the requirement at issue actually advanced California's legitimate interests at all.  *Id.* at 446-47.  Here, on the other hand, the Ninth Circuit has already concluded that section 12-41 imposes a slight burden that is justified by important state interests.  *Erum*, 881 F.2d at 693.

[12]  Griffin also alleges that section 12-41 violates section "1.4.3.3.3.1.2" of the Fourteenth Amendment.  ECF No. 24, PageID # 87.  On this point, Griffin cites a dictionary, not the Constitution of the United States.  *Id.*

that it is inherently more difficult for nonpartisan candidates to access the general election ballot.

For purposes of an equal protection claim, "partisan and independent candidates are not necessarily similarly situated." *Nader v. Cronin*, 620 F.3d 1214, 1218 (9th Cir. 2010); *see also Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012) ("Other federal appellate courts have come to the same conclusion, that for purposes of an Equal Protection Clause challenge to an election regulatory framework, partisan candidates and independent candidates are not similarly situated."); *De La Fuente v. Arizona*, 2019 WL 2437300, at *8 (D. Ariz. June 11, 2019) ("Courts have frequently recognized that the two groups and their approach to political activity is distinct."); *Nader v. Cronin*, 2008 WL 336746, at *7 (D. Haw. Feb. 7, 2008) ("Independent and political-party candidates are not similarly situated with respect to the State's election."). Just as "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other," *Jenness*, 403 U.S. at 441, there are also obvious differences between partisan and nonpartisan candidates.

Political parties must engage in organizational work that nonpartisan candidates can avoid. Moreover, because

established political parties have worked to build a base of support, partisan primaries are usually competitive. *See id.* at 440 (discussing the difficulties of winning a partisan primary). In this case, for instance, anyone participating in the Democratic Party's primary would have had to overcome Ed Case's 131,802 votes, and Republican candidates would have had to defeat four candidates who each received more than 4,000 votes.  Final Summary Report, Statewide Primary Election 2020, https://files.hawaii.gov/elections/files/results/2020/primary/his tatewide.pdf.  By contrast, Griffin, the only nonpartisan candidate, received 2,324 votes.  *Id.*

States are "not . . . guilty of invidious discrimination [if they] recogniz[e] these differences and provid[e] different routes to the printed ballot" for different candidates.  *Jenness*, 403 U.S. at 441–42.  States can require candidates from established parties, candidates from new parties, and nonpartisan candidates to show that they have a substantial modicum of support in different ways.  *Am. Party of Texas v. White*, 415 U.S. 767, 782–83 (1974) ("So long as the larger parties must demonstrate major support among the electorate at the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner.").  Those alternative paths only violate the Equal Protection Clause if one

30

is "inherently more burdensome than the other." *Jenness*, 403 U.S. at 441; *Ariz. Libertarian Party*, 925 F.3d at 1096 ("Equal protection is violated when one set of requirements is 'inherently' or 'invidiously' more burdensome than the other."); *Erum*, 881 F.2d at 695.

In *Erum*, the Ninth Circuit applied that test and concluded that an older version of Hawaii's election laws did not unconstitutionally discriminate against nonpartisan candidates. Because section 12-41 allowed winning partisan candidates to advance to the general election, but required nonpartisan candidates to meet certain thresholds, the Ninth Circuit first compared the showing that nonpartisan candidates had to make to establish their support with the showing that established parties had to make.  At the time, established political parties retained their status by "polling 10 percent of the votes cast at the preceding general election."  881 F.2d at 695.  Because "nonpartisan candidate[s] attain[ed] qualification by polling 10 percent of the votes cast for the office sought," the court was "unable to conclude that invidious discrimination [was] apparent in this comparison."  *Id.*

Under section 12-41, winning new party candidates also automatically advance to the general election.  *Erum* therefore went on to evaluate the showing that new parties had to make to establish their support.  *Id.*  As the law then stood, to be

31

included on a primary election ballot, new parties had to file a
petition signed by 1 percent of the number of people registered
to vote in the last general election.  *See* An Act Relating to
Political Parties, 1999 Haw. Laws Act 205, sec. 2 (codified as
amended at Haw. Rev. Stat. § 11-62).  Even though nonpartisan
candidates had to make a greater showing in the primary election,
the Ninth Circuit held that the burdens faced by nonpartisan
candidates were not inherently greater than the burdens faced by
new parties because new parties also had to "successfully
complete certain tasks" to be recognized as a party.  *Erum*, 881
F.2d at 695.

In the 30 years since *Erum* was decided, Hawaii has
amended its election laws to make it easier for established
parties to retain their status and for new parties to appear on
the ballot.  *See* Haw. Rev. Stat. § 11-61; Haw. Rev. Stat.
§ 11-62.  *Erum* nevertheless remains controlling.  Even after
considering those changes, none of the alternative paths Hawaii
provides for candidates seeking to access the general election
ballot is inherently more burdensome than any other path.

Most significantly, under section 12-41, nonpartisan
candidates qualify for the general election if they receive at
least as many votes as the successful partisan candidate who
received the least votes.  Thus, in comparison to partisan
candidates, it will *never* be more difficult for nonpartisan

candidates to qualify for the general election.  Nonpartisan
candidates will always qualify if they have more support than the
least popular partisan candidate.

Moreover, no amendment to Hawaii's election laws has
undermined *Erum*'s reasoning.  Griffin argues that the established
parties have created obstacles that place unique burdens on
nonpartisan candidates.  ECF No. 24, PageID # 86-87.  In so
arguing, Griffin relies only on the statutory scheme, without
alleging anything extrinsic.  But Hawaii's laws simply require
established parties and nonpartisan candidates to show that they
have a substantial modicum of support in different ways.  *See*
*White*, 415 U.S. at 782–83.  Established parties now retain their
status if they receive 4 percent of the cumulative votes cast in
races for state senator or state representative, or 2 percent of
the cumulative votes cast in races for state senator *and* state
representative.  Haw. Rev. Stat. § 11-61.  While section 12-41
requires nonpartisan candidates to receive 10 percent of the
votes in an single race, the nonpartisan candidate is not
burdened by the substantial coordination a party must engage in
to field candidates for many different offices in a single
election.

Griffin does not argue that Hawaii's laws discriminate
against him because new party candidates have an easier route to
the general election than nonpartisan candidates.  This court

33

therefore does not have to reach that issue.  This court does note that, under today's law, to form a new party candidates must submit a petition signed by 0.1 percent of the registered voters in the last general election.  Haw. Rev. Stat. § 11-61.  While *Erum* addressed a statute that required new parties to obtain the signatures of 1 percent of registered voters, the Ninth Circuit's reasoning did not depend on the precise number of signatures required.  Instead, the Ninth Circuit concluded that the nonpartisan route was not inherently more burdensome than the new party route because the law required new parties to complete certain tasks not applicable to nonpartisan candidates.  881 F.2d at 695.

That remains true today.  A new party must create an apparatus that includes party officers, a statewide central committee, and county committees.  *See* Haw. Rev. Stat. § 11-61(a)(2) (requiring new parties to submit a petition that is accompanied by "the names and addresses of the officers of the central committee and of the respective county committees of the political party and by the party rules").  New parties must also obtain the signatures of more than 800 registered voters on a petition.[13]  By contrast, to appear on the primary ballot,

---

[13] There were more than 800,000 registered voters in the 2020 general election.  State of Hawaii Office of Elections, Registration and Turnout Statistics, https://elections.hawaii.gov/resources/registration-voter-turnout-statistics/.

nonpartisan candidates only need to submit a petition with 25 signatures.  And the presence of "new party" candidates "actually enhances the independent candidate's chances of getting on the general ballot." *Erum*, 881 F.2d at 695 n.14.  Candidates from new parties are likely to have less support than candidates from established parties, and nonpartisan candidates will advance to the general election if they receive as many votes as a winning new party candidate.

In short, new parties must show they have a significant modicum of support by developing organizational capacity, while nonpartisan candidates make that showing by receiving a certain amount of votes in the primary.  Hawaii requires different candidates to demonstrate their support in different ways, *see White*, 415 U.S. at 782-83, but no route appears "inherently more burdensome than the other." *See Erum*, 881 F.2d at 695.  Griffin has not stated a claim[14] that Hawaii's electoral laws violate the Equal Protection Clause.  He has therefore failed to state a

---

[14]  Again, in *Eurm*, the Ninth Circuit reached this conclusion without citing any evidence submitted by the parties.  *See* 881 F.2d at 695.  This court therefore resolves this issue at the dismissal stage.

35

constitutional claim.[15]  His claims against Nago in his
individual capacity must be dismissed.

**V.       CONCLUSION**

        Defendants' motion to dismiss is granted.  Griffin has
already filed four complaints, and this court has now granted two
motions to dismiss.  For the reasons discussed above, this court
finds that granting Griffin leave to amend would be futile.  The
Second Amended Complaint is dismissed with prejudice.

        The Clerk of Court is directed to enter judgment for
Defendants and to close this case.

        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, May 27, 2021



                        /s/ Susan Oki Mollway
                        Susan Oki Mollway
                        United States District Judge


*Griffin v. State of Hawaii,* Civ No. 20-00454 SOM/KJM, ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS

---

        [15]  In prior filings, Griffin contended that the Office of
Elections "did not correctly apply" section 12-41.  *See, e.g.*,
ECF No. 15, PageID # 48.  Griffin did not include that argument
in the Second Amended Complaint.  Even if he had, that argument
would have failed.  The Office of Elections correctly concluded
that Griffin had not qualified for the general election ballot
because he did not receive 10 percent of the votes cast and did
not receive as many votes as the partisan candidate with the
least votes.